## Case No. 4,861.

FLEISHMAN v. The JOHN P. BEST.

[37 Leg. Int. 18;[1] 8 Wkly. Notes Cas. 30; 26 Int. Rev. Rec. 14; 14 Phila. 527.]

District Court, E. D. Pennsylvania. Dec. 29, 1879.

[1] [Reprinted from 37 Leg. Int. 18, by permission.]

[Henry Flanders, for libellant.

[M. P. Henry, for respondent.

BUTLER, District Judge. In May, 1878, the libellant shipped on board the John P. Best, then lying in the port of New York, and bound to Southampton, England, one hundred head of live cattle, to be carried on deck. The vessel started on the 16th of May, and on the fourth day out, the 19th, encountered a severe gale, in which all the cattle but thirteen were lost overboard. Sustaining considerable injury, and being in such condition as made the continuation of her voyage unsafe, she returned to Philadelphia, where the libellant attached her, alleging that the loss of his cattle resulted from the "careless, negligent and improper manner of stowing the underdeck cargo, which consisted of grain; rendering the vessel thereby wholly unseaworthy;" that in the lower hold there were no shifting boards, to keep the cargo in position, and that in consequence it shifted, throwing the vessel on her beam ends; by reason of which the deck load of cattle was carried overboard, and eighty-seven head lost. Subsequently the libellant amended his libel, charging unseaworthiness of the vessel in other respects; and claiming to recover, in addition to the loss sustained, on account of the cattle, the further sum of $2,000 and interest thereon,—the freight paid respondent in New York. The respondent's contract to carry on deck, made him responsible for the seaworthiness of his vessel. The libellant assumed all risks usual to a deck cargo; but nothing more. Loss, arising from unseaworthiness of the vessel, the respondent would be liable for. Unseaworthiness is charged in several particulars: First, as respects the stowage of the cargo in the hold; second, the condition of the coal bunkers and their covers; third, insufficiency and inadequacy of the pipes connected with the pumps; and, fourth, the absence of lining in the bilge, necessary to keep the grain from the pumps. The deficiency charged in the stowage of the cargo (as we have seen) consisted in the absence of "shifting boards." This charge, in my judgment, is well founded. The rules and usages of the port of loading, as well as of most, if not all, others in this country (which must be regarded as in the minds of the parties at the time of contracting), require the employment of such boards; and all the experienced seamen who, as witnesses, have spoken on the subject, concur in the judgment, that they are necessary, in stowing grain in bulk. That the master honestly sought to perform his duty in this respect, is not doubted. A foreigner, and unacquainted with our method of stowing such a cargo, he employed an experienced and reputable stevedore of the port, on whom he had a right to depend for compliance with our rules and usages. He is nevertheless responsible to the libellant to the extent of the loss he may have sustained from the improper stowage of the grain. Whether the other charges of unseaworthiness are well founded, is open to doubt; and in the view I entertain of the case, need not be decided.

To show unseaworthiness is not of itself sufficient to entitle the libellant to recover. He must further show that this occasioned his loss. He undertakes to do so by evidence that the ship "listed," either from the shifting of the grain, or from water entering through the coal bunkers, or both these causes combined; and that in consequence thereof, the cattle went over. As a severe storm prevailed at the time of the loss, and the cattle were liable to be swept off thereby, even in the absence of the "list" stated, the burden is on the libellant to prove his allegation. No presumption arises against the respondent from the loss of the cattle. To support his allegation the libellant relies upon the testimony of Thomas C. Douglass, who was in charge of the cattle. This witness testified that the "list" existed, virtually, if not actually, from the time the vessel left the port of New York, growing worse from day to day, and by the 19th had become so bad that the cattle went over, in consequence. If this statement could be accepted, the libellant's case would be complete. But it cannot. To me it seems to be so inconsistent with probabilities, and is so directly in conflict with the testimony of all other witnesses examined on this subject, that I must reject it. I do not mean to

disparage, or speak unkindly of, the witness; his statements may be strictly true; but the circumstances are such that I cannot accept them. · That the cargo was properly stowed, save in the absence of "shifting boards," to hold it steady, in rough weather, is not open to doubt. Until the vessel had been out for three days there was nothing to disturb the cargo; and all persons on board (except this witness), and the several persons who saw the vessel start out, say she was upright—having no such inclination, as Mr. Douglass states. On the 19th, however, as we have seen, she encountered a severe gale, about 4 o'clock in the afternoon. The sea swept over her, into her coal bunkers, damaging the wheel house, carrying away skylights, and, as the witnesses say, everything from her deck. According to the clear weight of the testimony the "list" occurred at this-time, and not before. All the witnesses on board (with the single exception stated), so testify, and the log (to falsify which no motive existed at that time, for the master was not then aware of any remissness respecting the cargo, or any other matter, bearing on the fact here involved) so states. For some hours previously the cattle had been going over, as a consequence, purely, I think, of the storm; and a large additional number were washed off by the sea which struck the vessel just before the "list" occurred; leaving probably not more than one-third of the number shipped, on board when the vessel settled over. Of this, in my judgment, the testimony leaves little room for doubt. For the cattle thus lost the respondent is not liable. Thirteen only of those remaining were saved; the others being lost during the following night. Is the respondent liable for the loss of these? The absence of "shifting boards" must be regarded as contributing to produce the "list." In the violent action of the vessel the grain shifted, as the log, and other testimony, shows, and assisted, at least, to hold the vessel over. It is not important that the water taken in, may have first caused the inclination. If it did, the shifting of the grain directly after, made the righting of the vessel impossible.

Although it cannot be affirmed that the cattle thereafter lost, would not have been lost, if the list had not occurred, its occurrence certainly increased the danger, and I think, must be considered as contributing to the loss which followed. While my mind is not so free from doubt respecting this branch of the case as that which precedes it, I believe the respondent should be held responsible for the cattle lost after the ship "listed." The number of these is uncertain. I think, however, it may, with reasonable safety, be put at twenty,—being one third of the whole number, less the thirteen saved. This corresponds with the master's estimate. And while it cannot, therefore, justly be complained of by the respondent, it is as favorable to the libellant as the testimony will admit of making it. His witness, Douglass, says fifty had gone over before noon.

As we have seen, the libellant paid the freight on the cattle, amounting to $2,000, in advance; and now demands its return. The rule that a shipper is not bound to pay freight without full performance of his contract by the carrier, is well understood. The goods must be delivered at the destined port, or no freight is earned. A partial conveyance is not a compliance with the contract; and it is no answer to a denial of freight, that the delivery was defeated by calamity. Where the freight has been paid in advance, it may, under such circumstances, be reclaimed. The distinction sought to be drawn between "payment" and "advance" of freight, seems to be without support either in reason or authority. To the rule that a contract for the carriage of goods is entire; entitling the carrier to freight only on delivery, an exception is made in favor of the carriage of live stock, dying on the voyage. The reason for this exception is nowhere stated. It must be found, I think, in the likelihood of such death occurring; and the justice of placing the loss of freight in that event on the shipper. It cannot be referred to the fact that the loss results from an "act of God," for such a basis would abrogate the rule. No greater reason exists for applying the exception to loss of stock from other cause—as from perils of the sea—than to any other cargo. The authorities exhibit no instance in which the exception has been applied to loss from other cause. The rule is subject of course to variation by the terms of a special contract. I find nothing in the contract before me, however, to vary it as respects this case. The respondent must therefore be required to return the freight received on account of the cattle lost on the voyage.